# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: June 10, 2025

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| STEPHEN HICKNER, M.D., | * | No. 21-02046V |
| | * | |
| Petitioner, | * | Special Master Young |
| | * | |
| v. | * | |
| | * | |
| SECRETARY OF HEALTH | * | |
| AND HUMAN SERVICES, | * | |
| | * | |
| Respondent. | * | |
| * * * * * * * * * * * * * * | * | |

*Scott W. Rooney*, Nemes Rooney, P.C., Farmington Hills, MI, for Petitioner.
*Parisa Tabassian*, U.S. Department of Justice, Washington, DC, for Respondent.

## **FACT RULING**[1]

On October 20, 2021, Stephen Hickner ("Petitioner") filed a petition pursuant to the National Vaccine Injury Compensation Program ("the Program").[2] Petitioner alleged that he suffered from chronic inflammatory demyelinating polyneuropathy ("CIDP")[3] resulting from an influenza ("flu") vaccine administered on October 26, 2018. Pet. at 2, ECF No. 1. However,

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub L. No. 99-660, 100 Stat. 3755 ("the Vaccine Act" or "Act"). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] CIDP is "a slowly progressive, autoimmune type of demyelinating polyneuropathy characterized by progressive weakness and impaired sensory function in the limbs and enlargement of the peripheral nerves, usually with elevated protein in the cerebrospinal fluid." *Dorland's Illustrated Medical Dictionary* 1468 (33rd ed. 2020) [hereinafter "*Dorland's*"]. Neuropathy refers to "a functional disturbance of pathologic change in the peripheral nervous system." *Id.* at 1250. Polyneuropathy, also known as peripheral neuropathy, is "neuropathy of several peripheral nerves simultaneously." *Id.* at 1468. Demyelination is "destruction, removal, or loss of the myelin sheath of a nerve or nerves." *Id.* at 480. A myelin sheath is "the cylindrical covering on the axons of some neurons." *Id.* at 1673. Axon is "the process of a neuron by which impulses travel away from the cell body." *Id.* at 183.

1

Respondent contended the temporal relationship between the administration of the vaccine and the onset of Petitioner's symptoms is too remote to establish causation. Resp't's Rept. at 15, ECF No. 60. After carefully analyzing and weighing all of the evidence presented in this case in accordance with the applicable legal standards,[4] I find that the record contains preponderant evidence that Petitioner's symptoms began no earlier than Spring of 2019, or approximately five months post vaccination.

I.  **Procedural History**

Petitioner filed his petition on October 20, 2021. Pet. Petitioner filed medical records on October 21, 2021. ECF No. 6; Pet'r's Ex. 4, ECF No. 7. He then filed an affidavit on October 25, 2021. Pet'r's Ex. 1, ECF. No. 9. Petitioner filed additional medical records between October 26, 2021, and December 8, 2021, as well as a statement of completion on February 9, 2022. Pet'r's Ex. 2, ECF No. 11; Pet'r's. Ex. 3 & 5, ECF No. 13; Pet'r's Ex. 6, ECF No. 15; Pet'r's Ex. 7, ECF No. 17; Pet'r's Ex. 8, ECF. No. 19; Pet'r's Ex. 9, ECF No. 21; ECF No. 23. Petitioner again filed additional medical records between August 3, 2022, and October 31, 2022, as well as an amended statement of completion on October 31, 2022. Pet'r's Ex. 10, ECF No. 33; Pet'r's Ex. 11, ECF No. 36; Pet'r's Ex. 12, ECF No. 39; Pet'r's Ex. 13, ECF No. 41; Pet'r's Ex. 14, ECF No. 43; Pet'r's Ex. 15, ECF No. 47; ECF No. 49. Petitioner filed additional medical records on December 20, 2022, and December 21, 2022. Pet'r's Ex. 16, ECF No. 51; Pet'r's' Ex. 17–20, ECF No. 53.

Respondent filed his Rule 4(c) report, opposing compensation, on January 31, 2023. Resp't's Rept. at 1. Among other issues, he argued that Petitioner had not presented reliable evidence to show the time between his flu vaccination and the actual onset of his symptoms was "medically acceptable to infer causation-in-fact." *Id.* at 15 (citation omitted). Respondent noted that Petitioner "initially reported neurologic symptoms on August 28, 2019, and inconsistently reported that his symptoms began between spring and summer 2019." *Id.* He further claimed that no evidence had been provided to support "a reasonable proximate temporal relationship of five or more months between vaccination and neurological symptom onset."[5] *Id.* at 16. Petitioner filed additional medical records in March and May of 2023. Pet'r's Ex. 21, ECF No. 65; Pet'r's. Ex. 22.

I held a status conference on October 3, 2023, to discuss the onset issue raised in Respondent's Rule 4(c) report. Min. Entry, docketed Oct. 3, 2023. Following the status conference, I issued a scheduling order directing Petitioner to file affidavits regarding the onset of his neurological symptoms and a motion for a fact ruling by November 15, 2023. ECF No. 73. Petitioner filed an affidavit from his wife, Carol Hickner, on December 13, 2023. Pet'r's Ex. 23, ECF No. 75. On December 14, 2023, Petitioner filed a brief addressing the onset issue and

---

[4] While I have reviewed all of the information filed in this case, only those filings and records that are most relevant to the decision will be discussed. *Moriarty v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision.") (citation omitted); *see also Paterek v. Sec'y of Health & Hum. Servs.*, 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

[5] Petitioner claimed the vaccination that allegedly cause his injury was administered on October 26, 2018. Pet. at 2.

requested the case proceed with expert reports. Pet'r's Br., ECF No. 77. Petitioner also filed supporting medical literature. Pet'r's Ex. 24–27, ECF No. 78. Respondent filed a response on February 6, 2024, and Petitioner filed a reply on April 1, 2024. Resp't's Br., ECF No. 80; Pet'r's Reply, ECF No. 82.

This matter is now ripe for consideration.

## II.     Factual Background

### A. Medical Records

On October 26, 2018, Petitioner received the Seqirus flu vaccine through his employment via Saint Joseph Mercy Health System. Pet'r's Ex. 2 at 3. On November 29, 2018, Petitioner presented to his primary care provider ("PCP"), Bruce Cicone, M.D. Pet'r's Ex. 6 at 18. He reported "worsening" hip pain but did not report any neurological symptoms, and Dr. Cicone noted Petitioner's neurological functions as "[n]ormal" upon physical examination. *Id.* at 18, 21. Dr. Cicone ordered an X-ray of Petitioner's hip, referred him to physical therapy, and prescribed him atorvastatin for his ongoing dyslipidemia. *Id.* at 18–19. On December 6, 2018, Petitioner underwent a right hip X-ray, which revealed advanced degenerative joint disease. Pet'r's Ex. 8 at 344.

On January 30, 2019, Petitioner presented to IHA Orthopedic Specialists ("IHA") with complaints of right hip pain. Pet'r's Ex. 13 at 1. Physician's assistant ("PA") Matthew N. Hodrosky administered a cortisone[6] injection into Petitioner's right hip. *Id.* Petitioner followed up at IHA again on April 17, 2019, with further complaints of right hip pain. Pet'r's Ex. 10 at 40. Petitioner stated the first injection had provided "significant pain relief," but its effects had worn off and requested a second injection. *Id.* PA Hodrosky diagnosed Petitioner with right hip osteoarthritis[7] and administered a second cortisone injection into Petitioner's right hip. *Id.* It was noted that Petitioner was scheduled to undergo a total hip arthroplasty[8] of his right hip on July 21, 2019. *Id.* No neurological symptoms were noted at either visit. *Id.*; Pet'r's Ex. 13 at 1; Pet'r's Ex. 10 at 40.

Petitioner was approved for surgery by orthopedic surgeon Michael Masini, M.D., on July 10, 2019, and the procedure was performed on July 23, 2019. Pet'r's Ex. 10 at 28; Pet'r's Ex. 8 at 86. Petitioner was discharged on July 11, 2019. *Id.* at 30. Petitioner followed up with Dr. Masini on August 14, 2019, and Dr. Masini did not note any neurological symptoms. Pet'r's Ex. 7 at 3. Dr. Masini noted Petitioner was "progressing well overall" and prescribed him physical therapy. *Id.*

Two weeks later, on August 28, 2019, approximately ten months after his vaccination, Petitioner presented to Dr. Cicone with complaints of numbness in his fingers and toes, right hip pain, and high blood pressure. Pet'r's Ex. 6 at 10. Dr. Cicone noted that Petitioner stated the onset

---

[6] Cortisone is "a natural glucocorticoid that is metabolically convertible to cortisol." *Dorland's* at 417.
[7] Osteoarthritis is "a noninflammatory degenerative joint disease . . . characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane." *Dorland's* at 1326.
[8] A total hip arthroplasty is "a plastic surgery [on both sides of the hip] joint." *Dorland's* at 155–56.

3

of the numbness "was [six] weeks ago" and included symptoms of paresthesia and referred Petitioner to a neurology specialist.[9] *Id.* On September 25, 2019, Petitioner again presented to Dr. Cicone with complaints of numbness in his right arm. *Id.* at 6. Dr. Cicone noted that Petitioner thought the numbness was related to his high blood pressure and hypertension. *Id.* Petitioner also received another flu vaccination at this appointment. *Id.* at 8. In the immunization screening questionnaire, Petitioner self-reported "No" to whether he had "ever had a serious reaction after receiving a vaccination" and whether he had "a seizure, brain, or other nervous system problem." *Id.*

Per Dr. Cicone's referral, on October 16, 2019, Petitioner presented to neurologist Amanda Rabquer, M.D., with complaints of numbness and tingling, which began prior to his July 2019 hip surgery. Pet'r's Ex. 5 at 1. Petitioner reported his symptoms had "waxed and waned" and were "equal in both hands." *Id.* He also reported that his symptoms worsened at the end of the day, especially when he "does more surgeries or keyboarding." *Id.* Physical examination revealed decreased reflexes in Petitioner's bilateral biceps, triceps, and brachioradialis. *Id.* at 2. Patella and ankle reflexes were also absent.[10] *Id.* Dr. Rabquer noted Petitioner's neuropathy[11] had progressed minimally since Petitioner's reported onset date and opined that carpal tunnel syndrome[12] "is a consideration given the more prominent symptoms in his hands and his type of work[,] but this would not explain the symptoms in his toes." *Id.* at 1. Dr. Rabquer assessed that the causation of Petitioner's symptoms was "unclear at this time" and ordered an electromyogram ("EMG") to "help sort things out." *Id.*

Petitioner's EMG was conducted on November 27, 2019, and revealed "evidence of a moderately severe right median mononeuropathy at the wrist without active denervation/carpal tunnel syndrome." Pet'r's Ex. 5 at 12. Dr. Rabquer noted "there was no evidence of a diffuse large fiber polyneuropathy." *Id.* Petitioner had stated that between this and the October 16, 2019, visit he had travelled for a conference for over a week and his symptoms had resolved. *Id.* However, Petitioner reported his symptoms had begun to return in his hands once he began working again. *Id.* Dr. Rabquer diagnosed Petitioner with bilateral carpal tunnel syndrome and advised him to wear wrist braces at night to help relieve his symptoms. *Id.* at 11.

Petitioner followed up with Dr. Rabquer on June 10, 2020, and reported a worsening of the symptoms in his hands and feet despite not having worked since the onset of the COVID-19 pandemic. Pet'r's Ex. 5 at 5–6. Petitioner reported that his paresthesia was spreading to his entire hand and the soles of his feet, that he was beginning to feel a burning sensation in his hands, and that he had begun to experience mild balance problems. *Id.* He reported that he had not been wearing his wrist braces consistently, and they were not providing much benefit. *Id.* at 6. Dr.

---

[9] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." *Dorland's* at 1362.

[10] Dr. Rabquer also noted Petitioner's reflex deficiencies may have resulted from her inability to fully relax the Petitioner's muscles. Pet'r's Ex. 5 at 1.

[11] This is the first instance in the medical record where Petitioner's symptoms were described as a "neuropathy." Dr. Cicone had previously referred to Petitioner's symptoms as "paresthesia" and "neuro-numbness" at Petitioner's visits on August 28, 2019, and September 25, 2019. Pet'r's Ex. 6 at 6, 10.

[12] Carpal tunnel is "an entrapment neuropathy characterized by pain and burning or tingling paresthesias in the fingers and hand, sometimes extending to the elbow." *Dorland's* at 1794.

Rabquer discussed with him the possibility of an early distal symmetric large fiber polyneuropathy and ordered magnetic resonance imaging ("MRI") of Petitioner's cervical spine to rule out any structural lesions. *Id.* at 5. Petitioner underwent the MRI on June 21, 2020, which revealed "[m]ild cervical spondylosis[13] . . . [m]ild-moderate cervical facet hypertrophy[14] . . . [and m]inimal/mild discogenic degenerative changes . . . [within the] cervical spine." *Id.* at 24.

On August 3, 2020, Petitioner presented to Shailee Shah, M.D., at the Mayo Clinic for his paresthesia. Pet'r's Ex. 3 at 3. He reported his symptoms began in the Spring of 2019 and described how they had spread from his fingertips and toes to the palms of his hands and the balls of his feet. *Id.* Dr. Shah assessed Petitioner to have ascending stocking glove distribution neuropathy. *Id.* at 4. Dr. Shah also observed Petitioner had reduced strength in both hands, "decreased sensation to temperature and pinprick up to the knees and mid forearms bilaterally," and reduced reflexes, and ordered broad testing to determine the cause of the neuropathy. *Id.* That same day Petitioner was also evaluated by Dr. Shah's supervisor, Oliver Tobin, M.B., who noted reflexes "absent throughout," reduced pinprick sensation in Petitioner's hands and feet, and reduced vibration sensation in his wrists and ankles. *Id.* at 7. Dr. Tobin assessed Petitioner to have a "slowly progressive sensory motor syndrome" in his peripheral nerve which was progressing faster than a genetic neuropathy. *Id.*

On August 3 and 4, 2020, Petitioner underwent a fat aspirate, lumbar puncture, and nerve punch biopsy, which showed a high protein level in Petitioner's spinal fluid. Pet'r's Ex. 3 at 9–12. Relying on these findings, in addition to Petitioner's previous EMG and current symptoms, on August 5, 2020, Dr. Tobin diagnosed Petitioner with chronic inflammatory sensory polyneuropathy ("CISP"), a form of CIDP, to be treated with intravenous immunoglobulin ("IVIG"). *Id.* at 12–13. The same day, Petitioner also underwent an EMG and MRI, which revealed evidence of a diffuse sensory peripheral neuropathy and enlargement of the lumbosacral plexus,[15] sciatic, and femoral nerves, respectively. *Id.* at 77–78, 99–100.

On August 6, 2020, Petitioner presented to neurologist Divyanshu Dubey, M.B.B.S., at the Mayo Clinic for further evaluation of his peripheral neuropathy. Pet'r's Ex. 3 at 13. Petitioner again reported to Dr. Dubey that his symptoms began in the Spring of 2019 and added that "[o]ver the next few months he started noticing numbness involving [his] toes as well." *Id.* Dr. Dubey noted Petitioner's "evaluations [were] concerning for sensory predominant immune mediated polyradiculoneuropathy"[16] and agreed with Dr. Tobin's recommendation to begin IVIG treatment. *Id.* at 16. On August 7, 2020, Petitioner presented to hematologist Mustaqeem A. Siddiqui, M.D., due to a concern of non-quantifiable IgG kappa from his serum protein studies. *Id.* at 18. Dr. Siddiqui opined that due to the current testing revealing a CIDP variant and Petitioner's sweat test resulting as normal, Petitioner's symptoms were "unlikely to be amyloid neuropathy" and he concurred with a CIDP diagnosis to be treated with IVIG. *Id.* at 17–18. Petitioner began his IVIG

---

[13] Spondylosis is the "dissolution of a vertebra." *Dorland's* at 1725.
[14] Hypertrophy is "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells." *Dorland's* at 886.
[15] The lumbosacral plexus is "a term applied to the lumbar and sacral nerve plexuses together, because of their continuous nature." *Dorland's* at 1442.
[16] Polyradiculoneuropathy is "any disease of the peripheral nerves and spinal nerve roots." *Dorland's* at 1470.

treatments at the Mayo Clinic on August 10, 2020, and received 12 total infusions at the Mayo Clinic between August 10, 2020, and November 6, 2020. Pet'r's Ex. 14 at 22, 36, 53–57, 67, 76, 85, 91–92.

On November 17, 2020, Petitioner presented to neurologist Amro M. Stino, M.D., to establish care closer to his residence in Michigan. Pet'r's Ex. 9 at 10, 18. Petitioner reported again that his symptoms began in the Spring of 2019 and progressed after undergoing a right hip surgery. *Id.* at 18. Dr. Stino noted Petitioner had "very mild pinprick loss in hands" and concurred with the diagnosis of the CISP variant of CIDP. *Id.* at 20, 22. Petitioner began weekly infusions of IVIG on November 19, 2020, and received 26 IVIG infusions at home between November 19, 2020, and August 12, 2021. Pet'r's Ex. 16 at 33–43, 648–759.

From February 23, 2021, to February 1, 2022, Petitioner continued regular follow-ups with Dr. Stino and the Mayo Clinic for the progression of his symptoms. Pet'r's Ex. 3 at 39; Pet'r's Ex. 9 at 66, 132, 205, 231; Pet'r's Ex. 16 at 444.

No other relevant medical records were filed.

### B. Affidavits

#### 1. Affidavit of Petitioner

On October 25, 2021, Petitioner filed a brief affidavit. Pet'r's Ex. 1. He stated that "[w]ithin days after receiving the vaccination, [he] felt numbness and tingling in [his] hands" and that he "developed fatigue, loss of muscle strength and stamina . . . sleeplessness[,] . . . [and] restless leg syndrome." *Id.* at ¶¶ 7, 10–11. He also stated that in "Spring 2019 . . . [he] noted progression of numbness and tingling of [his] hands and feet, which [he] reported to [his PCP]." *Id.* at ¶ 13. Petitioner further stated that his testing at the Mayo Clinic "confirmed a diagnosis of [CIDP]." *Id.* at ¶ 19.

#### 2. Affidavit of Petitioner's Wife, Carol Hickner

On December 13, 2023, Petitioner filed a brief affidavit by his wife, Carol Hickner. Pet'r's Ex. 23. She stated that "[i]n the ensuing weeks after [her] husband received the [f]lu vaccine on October 26, 2018, [she] observed a decline in his physical health." *Id.* at ¶ 2. She noted that Petitioner complained of "worsening tiredness and fatigue . . . restless legs in the evenings . . . and numbness and tingling in his hands and forearms." *Id.* at ¶¶ 3, 9–10. Ms. Hickner specifically noted that Petitioner had never complained of this numbness prior to his vaccination and that she had begun to observe him "dropping glassware . . . [having] difficulty buttoning his shirt and tying his ties . . . [and] occasionally stumble." *Id.* at ¶¶ 16, 17, 19. She also stated that Petitioner refused to go on walks or bike rides with her due to his symptoms. *Id.* at ¶¶ 5, 23. Ms. Hickner further stated that Petitioner began to complain of "numbness and tingling in his feet and a decline in balance" following his July 2019 hip surgery. *Id.* at ¶ 28. Due to Petitioner's ongoing symptoms, Ms. Hickner stated that she "urged him to make an appointment with Mayo Clinic" where he "was diagnosed with CIDP." *Id.* at ¶¶ 40, 43.

### III.    Parties' Arguments

In his brief, Petitioner discusses the issues regarding his symptom onset, including the contradictions between the affidavits and his medical records, and the medical theory supporting Petitioner's claim. With regard to Petitioner's medical records, Petitioner argues Respondent "confuses onset with delayed diagnosis," and cites to various pieces of medical literature[17] to indicate his symptoms were masked and reduced by two 80mg steroid injections in his right hip on January 30, 2019, and April 17, 2019. Pet'r's Br. at 5–6. Petitioner notes that "[c]ortisteroids are used commonly for initial treatment of [CIDP]" and that this "would have masked or lessened the CIDP symptoms to the extent that the treaters logically would have misdiagnosed the onset of the symptoms of CIDP." *Id.* at 6. Petitioner further argues that because he was "given cortisteroids for the treatment of his pain, it is clear that this would have ameliorated his CIDP symptoms, thus putting the purported onset as being later than it actually occurred." *Id.* at 6–7. Petitioner further notes that "[d]elayed diagnosis of CIDP has been reported to range from [two to] 64 months," and that a study had shown 26% of CIDP cases had a delayed diagnosis of 12 months or longer. *Id.* at 7 (citing Chaudhary & Rajabally at 2).[18] Petitioner thus argues that "[i]t is logical and factual that the cortisteroid injections that Petitioner received in January and April 2019 lessened his symptoms and created the perfect opportunity for both misdiagnosis, but also a misunderstanding of onset." *Id.*

With regard to Petitioner's medical theory, Petitioner notes that the above argument demonstrates that onset occurred earlier than the five to eight months indicated in his medical records, and even if it did not, that "the medical literature demonstrates that CIDP is often plagued by repeated episodes of demyelination and remyelination," and thus the Court should consider this as sufficient to support an onset later than 42 days after vaccination. *Id.* at 7–8 (citing Lewis & Muley at 3).[19]

Respondent argues that Petitioner's medical records "clearly and consistently document no neurological symptoms until August 2019, when [P]etitioner specifically state[d] the symptoms began six weeks prior (July 2019)." Resp't's Br. at 13 (citing Pet'r's Ex. 6 at 10). He further states that "[P]etitioner repeatedly reported the onset of his neurological symptoms as between Spring and Fall 2019." *Id.* Respondent also argues that because Petitioner is a physician he "would have been uniquely aware of the importance of accurately relaying the timeline of his symptoms to his treating medical providers." *Id.* Respondent further argues that Petitioner "unduly" focuses on the issue of delayed diagnosis, as "[a]ny references to symptoms waxing and waning in the medical

---

[17] G. G. A. van Lieverloo, et. al., *Corticosteroids in Chronic Inflammatory Demyelinating Polyneuropathy: A Retrospective, Multicentre Study, Comparing Efficacy and Safety of Daily Prednisolone, Pulsed Dexamethasone, and Pulsed Intravenous Methylprednisolone*, 265 J. NEUROL. 2052 (2018); P. James B. Dyck & Jennifer A. Tracy, *History, Diagnosis, and Management of Chronic Inflammatory Demyelinating Polyradiculoneuropathy*, 93 MAYO CLINIC PROC. 777 (2018).

[18] Umair J. Chaudhary & Yusuf A. Rajabally, *Underdiagnosis and Diagnostic Delay in Chronic Inflammatory Demyelinating Polyneuropathy*, 268 J. NEUROL. 1366 (2021).

[19] Richard A. Lewis & Suraj Ashok Muley, *Chronic Inflammatory Demyelinating Polyneuropathy: Etiology, Clinical Features, and Diagnosis*, UPTODATE (Aug. 11, 2023), https://www.uptodate.com/contents/chronic-inflammatory-demyelinating-polyneuropathy-etiology-clinical-features-and-diagnosis.

records occur **after** [P]etitioner began complaining of numbness and tingling to his medical providers . . . approximately ten months and beyond post vaccination. *Id.* at 13–14 (citing Pet'r's Ex. 5 at 6, 11–12; Pet'r's Ex. 9 at 18) (emphasis in original).

Respondent also notes that due to the timing of Petitioner's October 2018 vaccination and January 2019 cortisone injection, there were "three whole months without any potential steroid interference during which [P]etitioner should have reasonably been able to detect any neurological symptoms. Yet, he never reported to any medical providers that he experienced any neurological symptoms during that three-month period," *Id.* at 14. Further, Petitioner did not complain of symptoms after the first injection had worn off. *Id.* Respondent further notes that both injections were 80mg doses, "which is not high enough to suggest lasting systemic impact." *Id.* at 15 (citing Pet'r's Ex. 10 at 42; Pet'r's Ex. 13 at 1). He further argues that "[i]t is not clear whether such treatment would have had a global effect of disguising neurological symptoms throughout the whole body for multiple months." *Id.* Respondent concludes by noting that even if Petitioner's diagnosis was delayed, it "[has] no bearing on this onset issue," as "nowhere in the medical records did [P]etitioner ever report the existence of any symptoms related to CISP/CIDP prior to August 2019, and nowhere did he report that such symptoms began prior to Spring 2019." *Id.*

Petitioner's reply brief addresses the five- to eight-month time interval between vaccination and onset and argues that previous cases have stated "a longer interval is justified" for the onset of CIDP. Pet'r's Reply at 5 (citing *Glassberg v. Sec'y of Health & Hum. Servs.*, No. 07-303V, 2009 WL 464196, at *4 (Fed. Cl. Spec. Mstr. Nov. 23, 2009)). Petitioner further argues that while he is "a surgeon practicing in obstetrics and gynecology, he is not a clinical immunologist nor a neurologist." *Id.* at 6. He continues that "[t]he fact that he had a problem with fatigue, running, and clumsiness in the weeks and months post-vaccination does not mean that he should have related these to his general practitioner since these were not areas of inquiry by his nurse practitioner nor his treater." *Id.* Petitioner further notes the telehealth nature of Petitioner's early medical appointments did not provide the opportunity for a neurological examination. *Id.*

## IV.  Legal Standards

To receive compensation under the Vaccine Act, a petitioner must demonstrate either that: (1) the petitioner suffered a "Table injury" by receiving a covered vaccine and subsequently developing a listed injury within the time frame prescribed by the Vaccine Injury Table set forth at 42 U.S.C. § 300aa-14, as modified by 42 C.F.R. § 100.3; or (2) the petitioner suffered an "off-Table injury," one not listed on the Table, as a result of his receiving a covered vaccine. *See* 42 U.S.C. §§ 300aa-11(c)(1)(C); *Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1319–20 (Fed. Cir. 2006).

Special masters, as finders of fact, "are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence." *Moberly*, 592 F.3d at 1326. The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. § 11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record

regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993). Pursuant to Vaccine Act § 13(a)(1)(A), a petitioner must prove her claim by a preponderance of the evidence. A special master must consider the record as a whole but is not bound by any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of the petitioner's injury or illness that is contained in a medical record. § 13(b)(1).

In Program cases, contemporaneous medical records and the opinions of treating physicians are favored. *Capizzano*, 440 F.3d at 1326 (citing *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1280 (Fed. Cir. 2005)). This is because "treating physicians are likely to be in the best position to determine whether 'a logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Id.* In addition, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Hum. Servs.*, 933 F.2d 1525, 1528 (Fed. Cir. 1993). Indeed, contemporaneous medical records are ordinarily to be given significant weight due to the fact that "the records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Id.* Contemporaneous medical records are also generally found to be afforded greater weight than contradictory oral testimony. *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.").

However, there is no "presumption that medical records are accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (finding that a special master must consider the context of a medical encounter before concluding that it constitutes evidence regarding the absence of a condition.). While a special master must consider these opinions and records, they are not "binding on the special master or court." § 13(b)(1). Rather, when "evaluating the weight to be afforded to any such . . . [evidence], the special master . . . shall consider the entire record." *Id.*

In determining the accuracy and completeness of medical records, special masters will consider various explanations for inconsistencies between contemporaneously created medical records and later given testimony. The Court of Federal Claims has identified four such explanations for explaining inconsistencies: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).

### V.     Discussion

Ten months post vaccination, on August 28, 2019, Petitioner presented to Dr. Cicone, his primary care physician, with complaints of numbness and tingling in his fingers and toes, which

Petitioner reported began six weeks prior in July 2019. This was the first reported instance of Petitioner's symptoms found in the entirety of his medical record, and in each following instance, Petitioner consistently reported to physicians that his symptoms began in the Spring of 2019. I find that these contemporaneous records provide preponderant evidence that Petitioner's neuropathy symptoms began no earlier than five months post vaccination.

Petitioner relied heavily on the affidavits of himself and his wife to support the contention that his symptoms began in the "days" and "weeks" following his October 2018 vaccination. He asserted three arguments to support his claim: (1) the steroid injections he received in his right hip in January and April of 2019 masked his symptoms for five months; (2) the nature of CIDP and inability for in-person medical visits during the pandemic delayed his diagnosis; and (3) the gradual nature of CIDP requires acceptance of a longer timeframe for symptom onset and identification within the Program. Pet. Br. at 5. As discussed below, I find that these reasons and the evidence provided to support them do not sufficiently explain the inconsistences between the contemporaneously created medical records and later provided affidavits in this case.

### A. Petitioner's Steroid Injections

Petitioner's primary contention is that the steroid injections he received in his right hip in January and April of 2019 masked and reduced his CIDP symptoms "for at least five to eight months until they wore off which is consistent with the medical history timeline." Pet'r's Br. at 5. In addition to the statements made in the submitted affidavits, he supported this theory by citing primarily to two pieces of medical literature. However, both the medical literature itself and Petitioner's counsel's independent analysis[20] of it are insufficient to satisfy the preponderant evidence standard.

Petitioner cited to van Lieverloo, et. al. and Dyck & Tracy to demonstrate the effect of corticosteroids as a treatment for patients with CIDP. Petitioner specifically noted that corticosteroids are "used commonly for initial treatment of [CIDP]" and that due to Petitioner's cortisone injections, "it is clear that this would have ameliorated his CIDP symptoms, thus putting the purported onset as being later than it actually occurred." Pet'r's Br. at 6–7. However, the treatments outlined in the literature are not sufficiently comparable to Petitioner's treatment.

In Petitioner's case, he received two 80mg injections of methylprednisolone[21] administered four months apart. In the van Lieverloo et al. study, patients received intravenously "pulsed methylprednisolone, starting with 500mg daily for 4 days." Pet'r's Ex. 27 at 3. This was more than six times the dosage administered to Petitioner and more than twelve times the total amount administered to Petitioner over the course of his treatment. Additionally, the patients received the treatments in a much smaller timeframe of four days compared to the four months between Petitioner's injections. While van Lieverloo et al. does reference two other treatment methods with a lower steroid dosage, these treatment plans are also distinguishable. They both used steroids that

---

[20] It should be noted that Petitioner's counsel has not presented any credentials indicating any formal medical training he has received and is not a medical expert, nor does he hold himself out to be. No expert reports were filed by Petitioner in this case.

[21] Petitioner's exact medication received was DepoMedrol, which is a "trademark for preparations of methylprednisolone." *Dorland's* at 486.

were (1) different than what the Petitioner received in his injection; (2) administered orally; and (3) part of a significantly longer treatment regimen that included daily or regular administration for six to eight months. While all three forms of treatment referenced in the study saw approximately 60% of patients showed improvement, Petitioner has not shown how his treatment of only 80mg of methylprednisolone injected directly into his right hip at four months apart would have any similar impact on his symptoms, much less entirely mask them for five to eight months.

Petitioner's reliance on the Dyck and Tracy article suffers the same flaw. While the article does reference several studies detailing the success of using corticosteroids in the treatment of CIDP patients, all of these studies are for treatment plans which include doses administered closer together, over a longer period of time, and with a substantially higher total dosage than Petitioner's two 80mg injections.[22] Petitioner over relies on the fact that corticosteroids are used to treat CIDP. He provided no evidence or analysis as to how his specific course of treatment could have produced an effect similar to the results detailed in the studies he referenced.

Second, even if Petitioner's injections did mask his symptoms, it does not account for the asymptomatic three-month period between the date of Petitioner's flu vaccination on October 26, 2018, and his first hip injection on January 30, 2019. Petitioner attempted to explain this by referring to the affidavits of himself and his wife, which both indicate he began experiencing symptoms of fatigue, clumsiness, numbness, and tingling within the days and weeks immediately following his vaccination. He blamed pandemic era restrictions on healthcare for gaps in the medical record, and further argued that he did not report these symptoms to his PCP because they were beyond the scope of his care. There are instances where a person's failure to recount to a medical professional every symptom during the relevant time period is reasonable. *La Londe*, 110 Fed. Cl. at 203. Indeed, this occurs frequently in SIRVA cases, wherein a patient reserves shoulder complaints for an orthopedist, despite undergoing another, unrelated medical examination. However, this allowance still does not explain Petitioner's consistent statements throughout the medical record that his symptoms began in the Spring of 2019, or his initial statement in August 2019 that his symptoms began six weeks prior, in July 2019. Assuming that Petitioner did not feel his symptoms at that time were sufficient to warrant complaints to his treating physician, he made no mention of experiencing these symptoms during that period until he filed his affidavit for this case.

As explicitly stated in § 13(a)(1) of the Vaccine Act, "[t]he special master or court may not make a finding based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." And while case law does establish that a medical record itself cannot be presumed to be complete or accurate, *Cucuras* and *Gypsum* both show that consistent contemporaneous medical records can and should be given greater weight than later contradictory testimony. *See Kirby*, 997 F.3d at 1382–83 (holding that "*Cucuras* stands for the unremarkable proposition that it was not erroneous to give greater weight to contemporaneous medical records

---

[22] Dyck & Tracy, *supra* n. 17gl at 10 (referencing various studies showing "with **3 months** of oral prednisone reported some improvements," "**weekly** oral methylprednisolone treatment found remission in 6 of 9 patients after a **mean treatment period of 27 months**," "[1000mg] of intravenous methylprednisolone initially **daily and then monthly for 5 years**," and "**6 monthly doses** of dexamethasone . . . with a **daily dose** of prednisolone . . . for **5 weeks with tapering to none at the end of 32 weeks**." (emphasis added)).

11

than to later, contradictory testimony"); *see also Cucuras*, 933 F.2d at 1528 (citing *Gypsum*, 333 U.S. at 396 (noting that "the Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight")). Ultimately, Petitioner's assertion that his steroid injections masked his symptoms is not supported by the preponderant evidence to overcome his own statements to treaters that consistently identify his symptom onset at Spring 2019. Furthermore, the filed medical literature does not support Petitioner's contention that his treatment was rigorous enough to mask his symptoms for several months.

### B. Delayed Diagnosis vs Onset

Petitioner also argued that Respondent "confuses onset with delayed diagnosis," again relying on the claims contained in affidavits to show his symptoms began within a month of vaccination. Pet'r's Br. at 5. Petitioner cited to medical literature that notes CIDP is frequently misdiagnosed, resulting in delayed diagnosis of over 12 months in several cases. Indeed, in cases of polyneuropathy, it can be difficult for treaters to identify the specific condition given the symptom overlap within this umbrella of diseases. However, Petitioner does not explain how Petitioner's eventual CIDP diagnosis, delayed or otherwise, has any effect on when he first felt or reported the relevant symptoms of fatigue, numbness, and tingling. Petitioner asserted that the "waxing and waning" of his symptoms in the weeks immediately following his vaccination is indicative of relapsing-remitting CIDP and made it harder to diagnose. Pet'r's Br. at 5. That may be true, but diagnosis date is not at issue in this case. The issue here is the lack of evidence to support a symptom onset before the Spring of 2019 in the medical record.

Further, Petitioner only began to characterize his symptoms as "waxing and waning" after he initially reported experiencing symptoms in August 2019. In these two later statements, he continued to refer to his symptoms as beginning in "Spring 2019." Conversely, Petitioner's physicians consistently described his CIDP as "progressive," and not as relapsing-remitting, including Petitioner's diagnosing physician, Dr. Tobin. *See* Pet'r's Ex. 9 at 18, 66; *see also* Pet'r's Ex. 14 at 89, 286; Pet'r's Ex. 16 at 7, 290, 395, 445. As noted by the medical literature submitted by Petitioner and argued in Petitioner's own brief, "the course of CIDP can be varied and presentations include relapsing-remitting, stepwise progressive, or gradually progressive." Pet'r's Br. at 6 (citing Dyck & Tracy at 2). As such, Petitioner's description of his symptoms in his brief and affidavit is in contradiction with the reporting of his symptoms in the medical record.

As noted previously, special masters cannot make findings of fact based exclusively upon statements of the petitioner. § 13(a)(1). And while medical records themselves cannot be presumed to be complete and accurate, contemporaneous and consistent medical records are entitled to greater weight when balanced against later contradictory statements. *See Kirby*, 997 F.3d at 1382–83. Accordingly, I find that Petitioner's assertion that he delayed the reporting of his symptoms due to the relapsing-remitting nature of CIDP is not supported by the overall record and is therefore insufficient to overcome his own prior statements to treaters that consistently identify his symptom onset at Spring 2019.

### C. Delayed Onset Interval in CIDP Cases

Finally, Petitioner argued for a longer interval than the 42-day onset generally accepted by the Program for causation-in-fact of vaccine-induced CIDP. *Glassberg*, 2009 WL 4641696, at *4; *Krusemark v. Sec'y of Health & Hum. Servs.*, No. 16-1593V, 2021 WL 6774576, at *10 (Fed. Cl. Spec. Mstr. Dec. 29, 2021). However, Petitioner misconstrued both of the cases he relies on. In *Glassberg*, the petitioner argued that her eight-year-old son had demonstrated onset of CIDP symptoms within six weeks of receiving a flu vaccination, and not 75 days as indicated by the petitioner's medical records. 2009 WL 4641696, at *6. The court ultimately found for the petitioner, because it held that onset did in fact begin within six weeks of the vaccination and not 75 days later as indicated by the medical record. *Id.* at *7. In this case, Petitioner's argument that *Glassberg* supports a longer interval for causation-in-fact is simply incorrect. The line of reasoning relied upon by Petitioner, and which he submits as persuasive writing from the court, is in fact summarized testimony from an expert witness and not an accurate application of the case holding. In fact, the expert which Petitioner quotes in *Glassberg* expressly states that a period of 75 days would be too long for the flu vaccine to have caused that petitioner's CIDP. *See id.* at *6. This directly undercuts the roughly 150-day period here.

The decision in *Krusemark* also does not stand for this proposition, as this was a decision granting interim attorneys' fees to a petitioner who brought a CIDP claim. 2021 WL 6774576, at *10. Fees decisions use a lower standard when evaluating reasonable basis to determine whether to award fees, which is expressly held to be "something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." *Chuisano v. Sec'y of Health & Hum. Servs.*, 116 Fed. Cl. 276, 283 (2014); *see also Cottingham v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1346 (Fed. Cir. 2020) (holding that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis."). Further, the reference to *Glassberg* in *Krusemark* was to explain the nature of CIDP as a "insidious[,] gradually increasing condition," not to authoritatively or persuasively indicate a longer onset period was justified in such cases. *Krusemark*, 2021 WL 6674576, at *10 (citing *Glassberg*, 2009 WL 4641696, at *3). As such, I find these arguments to be insufficiently persuasive to support Petitioner's claim.

### VI. Conclusion

After careful review of the record, I find that the record contains preponderant evidence that Petitioner's neuropathy symptoms began no earlier than approximately five months after his October 26, 2018, flu vaccination. Petitioner has fourteen (14) days from the filing of this Ruling to file a status report indicating how he wishes to proceed.

**IT IS SO ORDERED.**

s/Herbrina D. S. Young
Herbrina D. S. Young
Special Master